IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DOMINIQUE WILLIAMS, | ) | CASE NO. 1:19-CV-02375-CAB |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| WARDEN DOUGLAS FENDER,[1] | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |

This matter is before the magistrate judge pursuant to Local Rule 72.2. Before the Court is the Petition of Dominique Williams ("Williams" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Williams is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Williams*, Cuyahoga County Court of Common Pleas Case No. CR-17-615064-A. For the following reasons, the undersigned recommends that the Petition be DISMISSED.

### I. Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir.

---

[1] Williams currently is incarcerated at the Northeast Ohio Correctional Center (https://appgateway.drc.ohio.gov/OffenderSearch) (last visited Sept. 30, 2021), where Dave Bobby serves as warden. Ohio Department of Corrections, Northeast Ohio Correctional Center, https://drc.ohio.gov/northeastocc (last visited Sept. 30, 2021).

2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011). The state appellate court summarized the facts underlying Williams' conviction as follows:

> {¶ 2} In March 2017, Williams was indicted on the following charges: Count 1, aggravated murder (victim Yanetta); Count 2, murder (victim Yanetta); Count 3, felonious assault (victim Yanetta); Count 4, attempted murder (victim Schilling); Count 5, felonious assault (victim Schilling); and Count 6, having weapons while under disability. With the exception of Count 6, the charges had accompanying one- and three-year firearm specifications. The case proceeded to a jury trial, at which the following pertinent facts were established.
>
> **Shooting at the Bar**
>
> {¶ 3} The M & M Saloon is located on Lorain Avenue near W. 125th and W. 126th Streets in Cleveland. At the time in question, Schilling, a police officer, was working off-duty as a security guard at the bar. His job was to pat down every customer that entered the bar in order to enforce the bar's zero tolerance for weapons on the premises and also to check identifications to make sure patrons were of age. Schilling testified that his pat-down searches were "thorough," and that if a patron attempted to bring a "normal sized" firearm into the bar he would have detected it. Schilling was dressed in his police uniform and was armed with his service weapon.
>
> {¶ 4} Surveillance video from the bar shows Schilling patting down Williams before he enters the bar sometime between 1:20 a.m. and 1:30 a.m. on the day in question. After Williams is cleared for entry, video surveillance shows him entering the bar; once inside, he is seen dancing, singing, and mingling with patrons.
>
> {¶ 5} The video shows victim Yanetta being patted down by Schilling at 2:24 a.m. Yanetta was cleared and entered the bar. Williams is seen on the video looking in Yanetta's direction. Williams, who had been dancing, stopped dancing, whispered into an unknown patron's ear, and exited the bar. The victim remained in the bar for the next few minutes, talking to various female patrons.
>
> {¶ 6} At 2:35 a.m., Yanetta exited the bar. Approximately two minutes later the video shows Schilling drawing his weapon and running out the front entrance of the bar — Schilling testified that he did so in response to hearing gunshots outside.
>
> {¶ 7} According to Schilling, as soon as he got outside, he saw Yanetta laying by the front entrance of the bar with several holes in his t-shirt. People outside the bar were "indicating" in a certain direction, and when Schilling looked in that direction he saw a man running away from the scene with a firearm in his right hand. Schilling pursued the suspect on foot, calling out "police" several times. The man continued to run, however, and eventually, the suspect turned around

and extended his right arm with the gun turned sideways. Schilling and the suspect then exchanged gunfire.

{¶ 8} Schilling testified that he was not sure who fired first, but admitted that a few days after the incident he told a detective that he (Schilling) had fired first. According to Schilling, he fired three or four shots before ducking into a doorway to call for backup; it was later determined, however, that Schilling had fired eight times. Schilling also testified that, at the time, he did not know whether his shots had hit the suspect. He also admitted that he never saw the suspect's face.

{¶ 9} Schilling saw the suspect "fall out" of one the boots he was wearing, then he lost sight of him. By that time, officers from the Cleveland Police Department had arrived on scene. One of the officers, James Hollenbeck ("Officer Hollenbeck"), immediately began searching for the suspect. He found a single boot laying in the front yard of a home on W. 126th Street, and also what appeared to be a trail of blood. He followed the trail, which led him to a house on W. 125th Street. There, he found a man, later identified as Williams, laying in the driveway with a gunshot wound and wearing one boot, a pair of jeans, and a grey-hooded sweatshirt with black stripes on the sleeves. The officer saw blood on the porch of the home, and discovered a firearm under the porch. Body camera footage from Officer Hollenbeck was played for the jury over the defense's objection.

{¶ 10} One of Williams's friends, Ricardo Stephens ("Stephens"), testified for the state. He stated that he went to the bar with Williams on the day in question. According to Stephens, Williams did not have a firearm on him that evening, and there was no firearm in the car they were riding in. Stephens testified that he left the bar so that he could smoke. He saw Williams leave the bar but did not talk to him. Moments later, he heard the gunshots and saw a chase ensue, but did not see who Schilling was chasing. The state requested to declare Stephens a hostile witness; the parties stipulated that the state be allowed limited cross-examination of him, during which Stephens admitted that Schilling was in pursuit of Williams.

**Collection of Evidence**

{¶ 11} Detective Walter Emerick ("Detective Emerick") of the Cleveland police processed the scene. He collected multiple .40 caliber shell casings outside the front entrance of the bar. The firearm he recovered from Officer Hollenbeck, who found it under the porch where Williams was located, was a Sig Sauer .40 caliber firearm; it had blood on it. Officer Emerick also recovered a .40 caliber shell casing near the one boot that was found. Emerick recovered Schilling's 9 mm service weapon and collected 9 mm shells from the scene. Additionally, he collected blood samples from the "trail of blood" and the blood found on the porch of the home where Williams was found.

**Autopsy of Yanetta**

3

{¶ 12} Dr. Thomas Gilson, the Cuyahoga County Medical Examiner, testified about the autopsy of Yanetta. Yanetta had nine gunshot wounds to his body, one of which was to his chest area and constituted a "life-threatening injury." A pellet was removed from the body and submitted for testing. The cause of death was the result of multiple gunshot wounds and the manner of death was homicide.

**Analysis of Evidence**

{¶ 13} Kristen Koeth ("Koeth"), a firearm and toolmaker examiner from the Cuyahoga County Regional Forensic Science Laboratory, performed all the ballistics testing in this case. Her testing included: (1) eleven .40 caliber cartridge casings, (2) one spent pellet from a hospital vial with Williams's name on it; (3) the Sig Sauer .40 caliber gun found under the porch of the house where Williams was found; (4) Schilling's Glock 9 mm firearm; (5) four spent 9 mm caliber cartridge casings, and (5) the pellet removed from Yanetta's body during the autopsy.

{¶ 14} Koeth testified that she test fired both the Sig Sauer .40 caliber firearm and the Glock 9 mm firearm and they were operable firearms. She determined that the pellet recovered from Yanetta during the autopsy was from the Sig Sauer .40 caliber firearm, and that the .40 caliber shell casings collected from the scene were also from that weapon.

{¶ 15} Koeth further testified that the pellet removed from Williams's body was too damaged to do comparative testing, but she testified that it was consistent with 9 mm or .38 special caliber ammunition. Koeth also testified that the 9 mm casings recovered from the scene came from Schilling's Glock 9 mm firearm.

{¶ 16} Lisa Moore ("Moore"), a forensic scientist from the Medical Examiner's Office, performed the DNA analysis in this case. She received a buccal swab from Williams, and used it to make comparisons to other items that were submitted for DNA testing. Specifically, she did testing on the blood that was found at the scene where Williams was found and arrested (i.e., blood on the driveway and the porch of the home where he was found, and a nearby back yard). Moore testified that the DNA from those samples all contained a single source of DNA and matched Williams's DNA. Additionally, Moore performed testing on the Sig Sauer .40 caliber firearm and its magazine and determined that both contained a single source of DNA that matched Williams's DNA.

{¶ 17} Lisa Przepyszny, a forensic scientist in the Trace Evidence Department of the Cuyahoga County Regional Forensic Science Laboratory, also testified at trial. After examining Yanetta's clothing, she opined that four of the shots were fired from greater than four feet away and one of the shots was fired from an intermediate range of one to four feet. She also examined Williams's clothing and found one live "CCI .40 Smith and Wesson" round of ammunition in his jeans pocket.

**Police Investigation**

{¶ 18} The lead detective on the case was Raymond Diaz ("Detective Diaz"). During the course of his investigation, Diaz recovered a cell phone that was taken from Williams when he was arrested. A video was recovered from the phone — the video was recorded on the day in question at 1:29 a.m. — which showed Williams with a gun in his hand upon exiting a vehicle.

{¶ 19} Detective Diaz also testified about learning during the investigation that an individual named Antonio Jones ("Jones") had been with Yanetta on the evening in question. The detective learned that Jones and Yanetta had arrived at the bar in the same vehicle; Jones remained in the vehicle while Yanetta went into the bar. Detective Diaz testified that he found out that Yanetta went to the bar "to fight." Jones got out of the vehicle when he heard the gunshots, and went over to where Yanetta lay. Jones took two cell phones from Yanetta's person and subsequently deleted files from them. The phones were turned over to the police several days later.

{¶ 20} Detective Diaz testified that the phones had pictures of Yanetta holding guns and stacks of money. One phone also had a picture of a docket belonging to a court case Williams had along with a witness list from the case.

{¶ 21} Further, Detective Diaz testified about a woman who appeared on a police body camera saying that the shooter was a black male wearing a grey "hoodie." The defense objected and requested a mistrial; the court sustained the objection on hearsay grounds, but denied the request for a mistrial. The court instructed the jury, "I sustained that last objection, and the statement made by the detective is to be disregarded by you."

**Williams's Case**

{¶ 22} After the state rested its case, Williams made a Crim.R. 29 motion for judgment of acquittal, that the trial court denied. Williams called one witness, Frances Williams, his cousin. She testified that on the night in question Williams was supposed to have attended a birthday party at another bar. She received calls from Williams to come pick him up from "somewhere on the west side" at 12:26 a.m.

{¶ 23} After presenting his witness, Williams renewed his Crim.R. 29 motion, that the trial court again denied.

**Jury's Verdict and Court's Sentence**

{¶ 24} On the above-mentioned testimony, the jury found Williams guilty of all counts except Count 4, the attempted murder of Schilling. The trial court merged Counts 1 through 3 (and the one-and three-year firearm specifications) for the purposes of sentencing (aggravated murder, murder, and felonious assault, respectively, of Yanetta).

5

{¶ 25} The state elected to proceed on Count 1, aggravated murder, with the three-year firearm specification. The trial court sentenced Williams to 25 years to life on the aggravated murder conviction, consecutive to three years for the firearm specification. The court sentenced Williams to four years on Count 5, the felonious assault of Schilling, consecutive to three years on the firearm specification. Counts 1 and 5 were ordered to be served consecutive. Further, Williams was sentenced to 36 months on Count 6, having weapons while under a disability, and Count 6 was ordered to be served concurrent to the sentence on the other counts. Thus, the trial court sentenced Williams to an aggregate prison term of 35 years to life.

{¶ 26} This appeal ensues, with Williams raising the following three assignments of error for our review:

I. The trial court erred in allowing the state to elicit hearsay statements and the cumulative effect of these statements denied appellant's right to a fair trial.

II. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the charge is not supported by sufficient evidence.

III. Appellant's convictions were against the manifest weight of the evidence.

*State v. Williams*, 2018-Ohio-3792, 2018 WL 4520959, at **1-4 (Ohio Ct. App. Sept. 20, 2018) (footnote omitted).

## II. Procedural History

**A. Trial Court Proceedings**

On March 9, 2017, the Cuyahoga County Grand Jury indicted Williams on the following charges: (1) aggravated murder in violation of Ohio Rev. Code § 2903.01(A) (Count One); (2) murder in violation of Ohio Rev. Code § 2903.02(B) (Count Two); (3) felonious assault in violation of Ohio Rev. Code § 2903.11(A)(1) (Count Three); (4) attempted murder in violation of Ohio Rev. Code § 2923.02/2903.02(A) (Count Four); (5) felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2) (Count Five); and (6) having weapons under disability in violation of Ohio Rev. Code § 2923.13(A)(2) (Count Six). (Doc. No. 5-1, Ex. 1.) Counts One through Three identified the victim as Yanetta and Counts Four and Five identified the victim as Schilling. (*Id.*) With the exception of Count Six, all counts carried a one- and

6

three-year firearm specification. (*Id.*) Williams entered pleas of not guilty to all charges. (Doc. No. 5-1, Ex. 2.)

The case proceeded to jury trial, and on October 20, 2017, the jury returned its verdict, finding Williams not guilty of attempted murder of Schilling (Count Four) but guilty on all remaining charges and firearm specifications. (Doc. No. 5-1, Ex. 7.)

On October 24, 2017, the state trial court held a sentencing hearing. (Doc. No. 5-1, Ex. 8.) After merging Counts One, Two, and Three and the accompanying firearm specifications, the court sentenced Williams to 25 years to life in prison for aggravated murder of Yanetta with three consecutive years for the firearm specification, four years in prison for felonious assault of Schilling (Count Five) with three consecutive years for the firearm specification, and 36 concurrent months in prison for having weapons under disability. (*Id.*) The aggregate prison term was 35 years to life. (*Id.*)

**B.    Direct Appeal**

On November 10, 2017, Williams, through counsel, filed a timely notice of appeal to the Eighth District Court of Appeals. (Doc. No. 5-1, Ex. 9.) In his appellate brief, he raised the following assignments of error:

> I.    The trial court erred in allowing the state to elicit hearsay statements and the cumulative effect of these statements denied appellant's right to a fair trial.
>
> II.   The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the charge is not supported by sufficient evidence.
>
> III.  Appellant's convictions were against the manifest weight of the evidence.

(Doc. No. 5-1, Ex. 10.) The State filed a brief in response. (Doc. No. 5-1, Ex. 11.)

On September 20, 2018, the state appellate court affirmed Williams' convictions. (Doc. No. 5-1, Ex. 12.) *See also State v. Williams*, 2018-Ohio-3792, 2018 WL 4520959, at *1.

7

On November 16, 2018, Williams filed a notice of delayed appeal to the Supreme Court of Ohio (Doc. No. 5-1, Ex. 13-14.) Williams explained that his delay was the result of improper information from a library aide and difficulty obtaining the proper paperwork while in segregation after being attacked by other inmates. (Doc. No. 5-1, Ex. 14.)

On January 23, 2019, the Supreme Court of Ohio denied leave to file a delayed appeal. (Doc. No. 5-1, Ex. 15.) *See also State v. Williams*, 114 N.E.3d 1205 (Table) (Ohio 2019).

C.     **Application to Reopen Appeal under Ohio App. R. 26(B)**

On December 10, 2018, Williams filed a *pro se* Application to Reopen Appeal Pursuant to Ohio App. R. 26(B). (Doc. No. 5-1, Ex. 16.) Williams' Application raised the following argument:

> The appellant was denied his constitutional right to be confronted with the witness against him when an office [*sic*] duty police officer testified he was told by a witness the Appellant was the assailant in this matter. The appellant never had a chance to cross-examine the witness and the court did not determine the witness was unavailable. The right to confront is guaranteed by the 6th Amendment to the United States Constitution and Article I Section 10 to the Ohio Constitution.

(*Id*.) The State filed a brief in opposition (Doc. No. 5-1, Ex. 17), to which Williams replied. (Doc. No. 5-1, Ex. 18.)

On March 27, 2019, the state appellate court denied the application. (Doc. No. 5-1, Ex. 19.) *See also State v. Williams*, 2019-Ohio-1119, 2019 WL 1418261 (Ohio Ct. App. March 27, 2019).

Williams did not appeal to the Ohio Supreme Court.

D.     **Federal Habeas Petition**

On October 2, 2019,[2] Williams filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

---

[2] Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities. *See Houston v. Lack*, 487 U.S. 266 (1988). While the Petition herein did not arrive at the Court for filing until October 9, 2019, Williams states that he placed it in the prison mailing system on

> **GROUND ONE**: The petitioner was denied his constitutional right [sic] confront an adverse witness in violation of the 14thAmend [sic] to the U.S.CONST.
>
>> **Supporting Facts**: Officer Schilling indicated as he got outside the bar, people outside the bar were indicating in a direction, and when he Schilling looked in that direction he saw a man running away with a gun, who witness said was the shooter.
>
> **GROUND TWO**: The petitioner was denied his 6th Amend.right [sic] to confront an adverse witness in violation to the U.S. Const.
>
>> **Supporting Facts**: Officer prosued [sic] the Petitioner as the shooter off statements made by people outside the club and never produce the people at trial who made the statements at trial as a result of these hearsay statement [sic] which led to all physical evidence.
>
> **GROUND THREE**: The petitioner was denied his constitutional right to confront an adverse witness in violation of the 6th & 14th Amend to the U.S. Const.
>
>> **Supporting Facts**: Officer Schilling testified he was told by people outside the bar the shooter was the petitioner the people was [sic] never produced and as [sic] result of the hearsay testimony the state acquired all physical evidence, and the conviction against the petitioner.

(Doc. No. 1.)

On February 11, 2020, Warden Douglas Fender ("Respondent") filed the Return of Writ. (Doc. No. 5.) Williams filed a Traverse on March 30, 2020. (Doc. No. 8.)

### III. Exhaustion and Procedural Default

**A.**     **Legal Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings. *See* 28 U.S.C. § 2254(b), (c). This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990).

---

October 2, 2019. (Doc. No. 1 at 12.) Thus, the Court will consider the Petition as filed on October 2, 2019.

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97S.Ct. 2497, 53 L.Ed.2d 594 (1977)). A claim may become procedurally defaulted in two ways. *Id.* First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.; see also Maupin v. Smith*, 785F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[3] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.") This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are

---

[3] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp. 2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28. Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id*. In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal. *Id.* Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted. *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138–39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice

11

requires showing that the trial was infected with constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219–20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S.722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). *See also Jones v. Bradshaw*, 489 F. Supp. 2d 786, 807 (N.D. Ohio 2007); *Allen v. Harry*, 497 F. App'x 473, 480 (6th Cir. 2012).

**B.      Application to Petitioner**

Respondent argues that all three grounds of Williams' Petition are procedurally defaulted, as Williams failed to raise these record-based claims on direct appeal. (Doc. No. 5 at 16.) To the extent Williams may argue ineffective assistance of appellate counsel excuses the default, Respondent asserts that claim has also been procedurally defaulted and may not serve as cause. (*Id.*)

Williams responds by asserting that the miscarriage of justice exception applies and allows federal courts to consider defaulted claims. (Doc. No. 8 at 1.) In addition, construing Williams' Traverse broadly, it appears he argues that because the Supreme Court of Ohio did not mention procedural default

in denying his motion for delayed appeal, the Supreme Court of Ohio considered his claims in his delayed appeal on the merits. (*Id.* at 3.)

The Court finds Williams' failure to present all three grounds to the state courts on direct appeal resulted in a procedural default. Therefore, Grounds One, Two, and Three are procedurally barred unless Williams "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. A habeas petitioner must "show that some objective factor external to the defense" caused his failure to comply with the state's procedural rule, *Murray*, 477 U.S. at 488, and if the petitioner fails to do so, the Court need not consider the prejudice prong. *Smith v. Murray*, 477 U.S. 527, 533–34 (1986).

      a.    **Cause and Prejudice**

The Sixth Circuit has held that cause to excuse the procedural default of a habeas claim may exist if a petitioner's appellate counsel was ineffective in failing to raise the issue. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004); *Smith v. Ohio, Dept. of Rehab. and Corr.*, 463 F.3d 426, 432 (6th Cir. 2006); *Berry v. Warden, Southern Ohio Corr. Facility*, 3:14CV2518, 2016 WL 4177174, at *3 (N.D. Ohio Aug. 8, 2016). However, the underlying claim of ineffective assistance of counsel must in and of itself not be in default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (finding unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance of counsel claim, that claim cannot serve as cause for another procedurally defaulted claim).

Although Williams raised a similar claim as he asserts in his federal habeas petition in his 26(B) application (Doc. No. 5-1, Ex. 16),[4] Williams failed to appeal the denial of 26(B) application to the Supreme Court of Ohio. (Doc. No. 5-1.) Williams offers no argument that there is cause and prejudice to excuse the procedural default of his ineffective assistance of appellate counsel claims. As a result, ineffective assistance of appellate counsel cannot serve as cause to excuse the procedural default of Grounds One, Two, and Three. As Williams fails to show cause, the Court need not consider the prejudice prong. *Smith v. Murray*, 477 U.S. at 533–34.

### b. Actual Innocence

As noted above, a petitioner's procedural default may be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman*, 501 U.S. at 749–50. In order to establish actual innocence, a habeas petitioner must show "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. *See also Jones*, 489 F. Supp. 2d at 807; *Allen*, 2012 WL 3711552, at *7. A petitioner must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See Schlup*, 513 U.S. at 327. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id*. at 316.

---

[4] Williams made no mention of the 14th Amendment to the United States Constitution in his 26(B) application. (Doc. No. 5-1, Ex. 16.)

Here, while Williams invokes the actual innocence exception, he does not assert he is actually innocent.[5] (Doc. No. 8.) Nor does he present any new, reliable evidence of his innocence. (*Id.*) Therefore, the Court finds Williams has failed to demonstrate the procedural default of Grounds One, Two, and Three should be excused on the basis of actual innocence.

### IV. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DISMISSED.

Date: September 30, 2021

    *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.** ***See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981);** ***Thomas v. Arn*, 474 U.S. 140 (1985),** *reh'g* ***denied*, 474 U.S. 1111 (1986).**

---

[5] Williams appears to focus on legal insufficiency of the evidence instead by highlighting the hearsay evidence and making "fruit of the poisonous tree' arguments. (Doc. No. 8.)